UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ADRIAN DAVIS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H- 19-4921 |
| | § | |
| AIRGAS USA LLC, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is a motion for summary judgment filed by defendant Airgas USA

LLC ("Airgas").  Dkt. 24.  Having considered the motion, response, reply, supplemental filings,

and applicable law, the court is of the opinion that Airgas's motion for summary judgment should

be GRANTED.

## I. BACKGROUND

This case is about a one-vehicle accident involving a jackknifed 18-wheeler tanker truck,

what or who caused the accident, whether the truck driver's employer terminated his employment

because he said there were problems with the truck to law enforcement at the scene of the accident

and reported the same to his employer, and whether these reports are protected "complaints" under

the Surface Transportation Assistance Act of 1982, 49 U.S.C. § 31105 (the "STAA").  The truck

was owned by Airgas, and the driver was plaintiff Adrian Davis, a former Airgas employee who

worked as a "bulk driver."  Dkt. 24.

On August 22, 2018, Davis and his co-driver, Greg Ramers, did a "pre-trip walkthrough"

of the truck and reported "no defects" on their vehicle inspection reports.  Dkt. 24-1 (Davis Dep.)

1

at 110; Dkt. 24-6 (Davis Dep. Ex. 9—Airgas Driver's Vehicle Inspection Report from Aug. 20, 2018); Dkt. 24-2 (Ramers Dep.) at 28–29.   Ramers drove in the morning, and Davis took over in the afternoon.   Dkt. 24-1 at 42; Dkt. 24-2 at 29–30.   As Davis was driving down the highway towards Greenville, Alabama, he contends he noticed a "Bendix" indicator light on the truck went from yellow to red and he started to hear a "funny sound."[1]  Dkt. 24-1 at 42.   Davis testified that a "Bendix indicator" "is like a lane indicator."  *Id.*  at 43.   He checked his mirrors and then "the truck locked down harder and started sliding in a straight line."  *Id.* at 42–43.   Davis contends that it "just slammed down [and] got real heavy," and he could do nothing to prevent the trailer from coming around.  *Id.* at 43.   He asserts that he yelled at Ramers to "hold on."  *Id.*  The truck was on the edge of the road, jackknifed, when it came to a stop.  *Id.* at 44.   A volunteer firefighter happened to be driving behind the truck on the road and was able to call an ambulance, police, and the fire department.  *Id.* at 44.

When the police arrived, Davis reported that "the truck ghost brake and there was nothing [he] could have done to prevent it from happening."  *Id.* at 44–45.   The Alabama police report states:

> On today's date Mr. Davis reported that while he was driving his company 18-wheeler South Bound on I-65 when the brakes locked up at the 130 exit. Mr. Davis lost control of the vehicle causing the 18-wheeler to jackknife . . . .

Dkt. 25, Ex. A.   Neither Davis nor Ramers initially reported any significant injuries, but the truck was a total loss.[2]  Dkt. 24-1 at 111; Dkt. 24-2 (Delussey Dep.) at 84–85.

---

[1] The parties seem to use the terms Bendix, OnGuard, and collision avoidance system to refer to the same system or components within that system.

[2] Davis contended during his deposition that he fractured his wrist by jamming it in the steering wheel and that "it [has] been difficult emotionally getting back into a truck."  Dkt. 24-1 at 48.   The

2

When Davis reported the accident to Airgas, he said the truck malfunctioned. Davis reported that the cruise control was on and the truck's automatic braking system took over and applied the brakes before he applied them. Dkt. 24-1 at 51–52. Airgas wanted him to drive the truck home, but Davis requested that a mechanic inspect it first. *Id.* at 46–47. A mechanic inspected the tires and brakes and said they were okay, but he would not guarantee that the truck would not "ghost brake" again. *Id.* at 47.

Airgas conducted an investigation of the accident. This included an initial accident report (the "Initial Report") that started with an interview of Davis. Dkt. 24; Dkt. 24-1 at 51; Dkt. 24-2 at 57. The Initial Report, which was prepared by Brian Hicks and Todd (DeWaine) Green, indicates that Davis stated that the collision avoidance system locked up the brakes, causing the truck to jackknife. Dkt. 25, Ex. B (Dkt. 25-2) ("Driver stated – while traveling on I-65 Greenville, Al. the collision avoidance system locked up the brakes causing the unit to jackknife."). The "probable immediate cause[s]" included "improper handling," "improper use," "inattentive," "lack of skill/experience," and "defective equipment." *Id.* The concluding section of the Initial Report indicated that the accident was "non-preventable" due to "improper engineering" and that no additional investigation was required. *Id.* However, it also stated that there were documents pending, and they were "[w]aiting on Bendix report." *Id.*

The next step in the investigation process after the Initial Report was a review by the accident review team. Dkt. 24-2 at 57. The team requested data from the truck's black box, and third parties downloaded and analyzed the data and prepared a report (the "Black Box Report"). Dkt. 24; Dkt. 24-8 (Evans Dec.) & Ex. 2 (report). The Black Box Report, which is dated October

---

complaint states that he "suffered a broken wrist in the crash, and he could have been killed." Dkt. 1.

1, 2018, indicated that cruise control was not engaged when the truck jackknifed and that Davis engaged the brakes before the automatic braking system engaged. Dkt. 24-8. It also showed that the vehicle decelerated from 64.87 miles per hour to zero miles per hours in eight seconds. Dkt. 24-6 (Davis Dep. Ex. 11) at Airgas-00481 (report).

After receiving the Black Box Report, the team interviewed Davis and Ramers again on November 2, 2018. Dkt. 24. Davis again stated that he had the cruise control on and he did not apply the brakes. *Id.* (citing Davis Dep. at 63 (Q: "[S]o what you told them was you were on cruise control and you didn't apply the brakes at all?" A: "Correct.")). Airgas personnel then explained that this version of events did not match the Black Box Report. Dkt. 24-1 at 64–65.

Davis testified that the forensic diagnosis "cleared [him] of any wrongdoing" and that a camera on the truck had a crack in it that caused the radar to be out of adjustment and the truck to activate ghost braking. *Id.* at 65, 67. Davis contends that "the reason why they call it ghost braking [is] because you can't capture that information; it don't exist." *Id.* at 66.

After the meeting on November 2, 2018, Airgas suspended Davis with pay pending further investigation. *Id.* at 68. On November 30, Airgas closed the investigation and issued a final report (the "Final Report") that concluded: "After further review of Data, [it] was determined that the driver applied the brakes and all indications point to driver error." Dkt. 24-8, Ex. 1. Additionally, the report concluded the accident was preventable, the probably underlying root cause was improper procedure, and the justification for this determination was as follows: "After review of Data from Bendix and PeopleNet [(the Black Box Report)] indicating that the driver applied the brakes and abruptly turned the steering wheel, this was determined to be driver error." *Id.*

On the same day that Airgas issued its Final Report, it terminated Davis's employment. *See* Dkt. 25, Ex. C (termination notice). The termination was pursuant to a Driver Discipline

4

Acknowledgment form that Davis had signed on November 30, 2009, which states: "Preventable vehicle accident resulting in property damage, bodily injury and/or general liability over $1,000 – **Subject to termination**."  Dkt. 24-5, Ex. 1.  The "negative financial impact to Airgas" from the accident was approximately $100,000.  Dkt. 24-8 (Evans Dec.).  The termination occurred roughly 100 days after the accident.  Davis contends that Airgas did not fire him for a "preventable accident" as it claims and that instead it fired him because he had previously complained about the truck's brakes locking up to Airgas and reported it to the Greensville, Alabama Police Department at the time of the accident.  Dkt. 25.  He contends that his termination was in retaliation for these complaints, in violation of the STAA.  *Id.*

Airgas now moves for summary judgment, arguing that Davis cannot show that he made safety complaints and, even if he could, Airgas has a legitimate nondiscriminatory reason for terminating his employment.  Dkt. 24.  Namely, Airgas contends Davis was involved in a preventable and serious accident and it terminated his employment pursuant to its policy to terminate drivers who have these types of accidents.  *Id.*  It provides evidence that it contends shows Davis was at fault (the Black Box Report).  *Id.*

Davis asserts that Airgas's alleged nondiscriminatory reason for terminating his employment is pretext and provides evidence that he claims shows the accident was not preventable.  Dkt. 25.  The parties also disagree as to whether Davis's complaints constitute "protected activity" under the STAA.  Dkts. 24, 25.  The motion for summary judgment is now ripe for disposition.

## II.  Request to File a Sur-Reply

In addition to the motion, response, and reply, Davis filed, without leave of court, a sur-reply that includes two additional exhibits.  Dkt. 27.  In the sur-reply brief, Davis asserts that after

the accident Nathan Jennings, a former Airgas employee, sent emails to Airgas about the truck in question during the accident investigation, and Airgas did not produce these emails in discovery. *Id.* Davis seeks leave to amend or convert a Jennings email dated February 8, 2019, which he attempted to attach to his response,[3] into an affidavit.[4] *Id.* He asserts he just received the emails from Jennings on April 12, 2021. *Id.* That is one day before he filed the sur-reply. He then notes the court should allow an "amended pleading" unless Airgas can show it would be prejudiced by any delay. *Id.* He further notes that his counsel originally thought the evidence qualified as a business record because it was on Airgas letterhead, and his failure to file an affidavit was not in bad faith. *Id.*

Airgas responds that the sur-reply should not be considered because there was no motion to submit additional briefing. Dkt. 28. It further notes that even if the court were to consider it, it relates to a 2017 concern that was over a year prior to the accident and is about loud beeping from a cruise control device. *Id.*

While Davis's sur-reply did not follow correct procedural guidelines, the court finds that the information he seeks to add to the record was not available to him at the time he filed his response and that there was no bad faith in the untimely filing. The court therefore will allow the additional evidence. Davis's motion, contained within his sur-reply, to file Jennings's affidavit and related evidence is GRANTED. The court will consider this evidence. The court also GRANTS leave to file the sur-reply.

---

[3] In the response, Davis cites to Exhibit D and indicates that it is a supplemental expert report that contains Jennings's statement. Dkt. 25 at 9. However, nothing was uploaded into the court's electronic docket other than a cover page. *See* Dkt. 25-4.

[4] By convert the emails into an affidavit, it appears Davis means that he seeks to submit an affidavit to authenticate the emails. He attached an affidavit from Jennings dated April 13, 2021, to the sur-reply.

### III. Legal Standards

#### A.     Motion for Summary Judgment

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

#### B.     STAA

While complaints under the STAA are typically considered by the Secretary of Labor and reviewed, if necessary, by a federal court of appeals, *see* 49 U.S.C. § 31005, a district court may exercise jurisdiction if the Secretary of Labor fails to issue a final decision within 210 days after the filing of a complaint.  49 U.S.C. § 31,995(c).  That is how the court has jurisdiction in this case. *See* Dkt. 17.

Under the STAA, a

> person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because—
> (A)(i) the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order, or has testified or will testify in such a proceeding; or

7

> (ii) the person perceives that the employee has filed or is about to file a complaint or has begun or is about to begin a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order . . . .

49 U.S.C. § 31105(a). This law "was enacted in 1983 to encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles." *Brock v. Roadway Express*, 481 U.S. 252, 258, 107 S. Ct. 1740 (1987).

Courts use the *McDonnell Douglas* framework to analyze claims of retaliatory discharge in violation of the STAA. *See Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)). Under this framework (adapted to the STAA), the plaintiff must first establish a prima facie case of retaliatory discharge. *Id.* The prima facie case requires a showing that 1) the plaintiff was engaged in protected activity; 2) the plaintiff was the subject of an adverse employment action; and 3) there was a causal connection between the two. *Id.* (citing *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)). If the plaintiff can establish a prima facie case, it raises an inference that the employer took the adverse action because the plaintiff engaged in protected activity. *Id.* The burden of production then shifts to the defendant, who must "articulate a legitimate, nondiscriminatory reason for its employment decision." *Id.* If the defendant rebuts the inference of retaliation raised by the prima facie case, "the plaintiff bears the ultimate burden of demonstrating by a preponderance of evidence that the legitimate reasons were pretext for discrimination." *Id.*

IV. ANALYSIS

**A.      Prima Facie Case**

Airgas argues that Davis cannot make out a prima facie case because he did not engage in protected activity.  Dkt. 24.  It notes that Davis concedes he never complained to management about the truck and asserts that his discussion with law enforcement at the scene of the accident about ghost braking does not constitute protected activity under the STAA.  *Id.*  Airgas contends that any complaints Davis made were too generalized to qualify as protected activity.  *Id.* (citing *Moon*, 836 F.2d at 229–30).

Davis contends that courts interpret "protected activity" broadly.  Dkt. 25.  He asserts that he complained to Alabama police about the ghost braking and complained specifically to Airgas about the collision avoidance system failure.  *Id.* (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 131 S. Ct. 1325 (2011)).

Airgas cites Davis's deposition testimony to support its assertion that Davis did not engage in protected activity and under the STAA.  Dkt. 24.  During Davis's deposition, he admitted that he did not "voice any safety concerns to management" and did not refuse "to engage in an unlawful work practice prior to his accident."  *Id.* (citing Davis's deposition).  He also said he did not file any complaints or note defects in the truck involved in the wreck or raise complaints about safety issues or ghost braking to the supervisor who made the decision to terminate his employment (DeLussey).  *Id.*

Airgas concedes that Davis did state that he had discussed ghost braking with mechanics and his former supervisor, who had left Airgas prior to the accident, and his former supervisor had mentioned it during a safety meeting in 2014 or 2015.  *Id.*  Airgas contends that these discussions about safety issues do not rise to a violation of the STAA, which requires filing, perceiving to have

9

filed, or perceived to be about to file a complaint. *Id.* It cites two Administrative Law Judge decisions indicating that generalized complaints are insufficient. *Id.*

Airgas contends that Davis's statement to law enforcement about the brakes does not qualify as protected activity for the same reason. *Id.* It asserts that if such generalized statements to police qualified, "then nearly every commercial driver in an accident would be engaged in protected activity when describing the vehicle to law enforcement authorities." *Id.* Instead, Airgas contends Davis was merely performing a job duty when he interacted with law enforcement. *Id.*

Davis argues that the Department of Labor and courts interpret "protected activity" broadly. He lists several activities that he contends have been interpreted as "protected activity," but he provides citations for a few of these activities. *See* Dkt. 25 at 5–6. He notes that he complained that the brakes locked up to a police officer from the Greensville, Alabama Police Department on the day of the accident, and he complained that the collision avoidance system locked up the brakes to Brian Hicks, the Airgas safety director, the next day. *Id.* at 6–7. Hicks documented this in the Initial Report. Dkt. 25, Ex. B. Davis argues that these complaints are protected activity under "well-settled law," citing the STAA and *Kasten*, a case that deals with retaliation under the Fair Labor Standards Act and held that oral as well as written complaints qualify as "protected activity," to support this statement.

Internal complaints to company management can qualify as protected activity; the "complaint must be based on a reasonable belief that the company was engaging in a violation of a motor vehicle safety regulation." *Calhoun v. U.S. Dep't of Labor*, 576 F.3d 201, 212 (4th Cir. 2009) (cleaned up). Courts generally construe the complaint requirement broadly, but "there is a point at which an employee's concerns and comments are too generalized and informal to constitute 'complaints' that are 'filed' with an employer within the meaning of the STAA." *Clean*

*Harbors Env't Servs., Inc. v. Herman*, 146 F.3d 12, 22 (1st Cir. 1998).  The "complaint must relate to actions reasonably perceived to be commercial motor vehicle safety violations."  *Evans v. USF Reddaway, Inc.*, No. 1:15-CV-00499-EJL-REB, 2017 WL 2837136, at 86 (D. Idaho June 30, 2017).

Here, the court finds that whether Davis engaged in protected activity when he told the police officer what he believed caused the accident and when he reported his belief about the cause to his employer is a close call.  The purpose of the STAA whistleblower provision is to "encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles."  *TransAm Trucking, Inc. v. Admin. Rev. Bd.*, 833 F.3d 1206, 1212 (10th Cir. 2016) (quoting *Brock*, 481 U.S. at 258).  Here, Davis reported what he believed caused the accident to the police and his employer in response to an investigation into the accident's cause.  This does not appear to be an independent complaint to bring the employer into compliance, but rather part of his job requirements.  However, his deposition testimony indicates he also felt it was a safety concern.  Since courts construe this provision of the STAA broadly and inferences must be drawn in favor of the nonmovant at the summary judgment stage, the court finds that Davis has met his prima facie burden of demonstrating that he engaged in protected activity.  *See Env't Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008); *see also Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) ("In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.").

In order to meet his prima facie burden, Davis must also show that there was an adverse action and a causal connection between his protected activity and the adverse action.  There is no

11

dispute that the termination of Davis's employment is an adverse action, but Airgas does dispute whether there is a causal connection between Davis's reports and his termination.  Davis argues that the court should infer causation because of the timing of his termination and because Airgas initially said the accident was non-preventable and then changed to saying it was preventable. Dkt. 25.  Airgas asserts that all of the alleged protected activity occurred months before the decision to terminate Davis's employment.  Dkt. 24.  The arguments relating to causal connection at the prima facie stage are interlaced with the arguments that Airgas's purported reason for terminating Davis's employment is pretext, so the court will address the causal connection concurrently with the analysis of Davis's pretext arguments in Section IV.C, *infra*.

The court now turns to whether Airgas can meet its burden to produce a legitimate reason to terminate Davis's employment notwithstanding the alleged protected activity, and, if so, whether Davis has shown there is an issue of material fact that this reason is pretext and or otherwise met his summary judgment burden.

**B.     Reason for Termination**

Airgas asserts that it terminated Davis's employment because evidence from the "black box" on the truck (the Black Box Report) indicated that Davis caused the accident, and it has a policy to terminate drivers who are involved in serious, preventable accidents.  Dkt. 24.  Airgas contends that the Black Box Report showed that Davis's foot was on the accelerator and then on the brake and that no cruise control was engaged.  *Id.*; *see* Dkt. 24-6, Ex. 11 (Ex. 11 to Davis Dep.) (showing that the driver applied braking for 7.5 seconds and the ABS activated).  Airgas asserts that it reasonably relied on the accuracy of the Black Box Report, concluded that Davis was at fault for a serious accident, and terminated Davis's employment based on its policy to terminate employees who are at fault for serious accidents.  Dkt. 24.

12

As evidence of the policy, Airgas provides a form Davis signed in 2009 along with a declaration and termination notices indicating that other drivers who did not engage in protected activities were also terminated when involved in serious accidents.  Dkt. 24, App. E, Ex. 1 (Dkt. 24-5) (Ex. 1 to Davis Dep.—2009 form); Dkt. 24-8 & Exs. 3-4 (termination notices of David Garcia and Stephen Jones—drivers whose employment was terminated for preventable accidents). The form that Davis signed in 2009 states that employees are subject to termination for a "[p]reventable vehicle accident resulting in property damage, bodily injury and/or general liability over $1,000."  Dkt. 24, App. E, Ex. 1 (Dkt. 24-5).

Airgas also provides the Black Box Report.  Dkt. 24-8 (Evans Dec.) & Ex. 2 (report from Knorr-Bremse Group about the data from the Bendix Data Recorder, from meeting on Oct. 1, 2018).  The Black Box Report indicates that, despite Davis's contention that the truck's ghost brake engaged, Davis engaged the brake himself.  Dkt. 24-8, Ex. 2.  This report shows that the vehicle decelerated from 64.87 miles per hour to 0 miles per hour in eight seconds, that the steering angle changed from zero to -343.81 degrees in six seconds, that the driver applied braking from 7.5 seconds and the ABS activated, that the driver applied braking first, followed by a Wingman intervention 1.5 seconds later for a one second duration, and that no stability intervention was triggered.  *Id.*  Airgas management believed the Black Box Report showed the accident was preventable.  Dkt. 24-8 ("The third-party report of the "black box" data from the accident showed that Adrian Davis hit the brakes on the truck before the automatic braking system engaged and that cruise control was not engaged."); Dkt. 24-9 ("Mr. Davis was terminated based on the third-party data analysis and the severity of the accident.").  The accident caused approximately $100,000 in economic loss to Airgas.  Dk. 24-8.

13

Airgas also provides Davis's termination notice, which specifically states that the reason for Davis's termination was a "preventable motor vehicle accident" and that this accident had "a negative financial impact of approximately $100,000 to the organization." Dkt. 24-5. It goes on to say that Airgas did "months of a thorough and exhaustive investigation" before deeming the accident preventable. *Id.*

The court finds that this evidence satisfies Airgas's burden of producing a legitimate nondiscriminatory reason for terminating Davis's employment.

**C.     Causal Connection/Pretext**

Davis argues, however, that this reason is pretext and that the real reason for his termination is because he complained about faulty equipment on the truck. Dkt. 25. Davis points to the following evidence to support this contention: (1) the police report from the accident; (2) the initial Vehicle Accident report dated September 3, 2018; (3) Ramers's deposition testimony; (4) a repair estimate for the collision avoidance system in the truck; (5) an email from Jeffrey Delussey (Davis's direct supervisor) to Michael Evans (Airgas's Director of Transportation–in charge of disciplinary actions) about other instances of problems with ghost braking on Peterbilt trucks; and (6) Nathan Jennings's (former Airgas employee and Davis's former supervisor) affidavit stating the accident was not preventable and emails from Jennings about 2017 problems with the collision avoidance system. *Id.* The Record also contains an expert report in which the expert opines the accident was not preventable. Dkt. 23-1. Davis asserts that the court should infer from this evidence that the real reason his employment was terminated was retaliation because (1) the timing of his termination, which was around 100 days from the date of his complaint to Alabama police about the ghost braking and corresponding separate complaint to Airgas about the collision avoidance system failure that occurred during the accident (*see* Dkt. 25 at 7 (citing the Initial

14

Report as evidence of his complaint to Airgas)); and (2) his evidence supports his contention that the accident was not preventable. Airgas replies that each of Davis's arguments is either taken out of context or is improper for consideration on summary judgment. Dkt. 26. The court will consider each piece of evidence *in seriatim*.

### 1. Police Report

The police report from the accident states that Davis reported that the brakes locked up. Dkt. 25, Ex. A (Dkt. 25-1). This shows that Davis complained about the alleged ghost braking, but it does not show how that complaint is connected to his termination.

### 2. Initial Report

Davis asserts that the Initial Report, dated September 3, 2018 (Dkt. 25-2 (Ex. B)), shows that Airgas "***admitted*** the accident was ***non-preventable***." Dkt. 25. The report states that the accident was "non-preventable," that the probable underlying root cause was "improper engineering," and that the justification for the probable root cause was "mechanical failure pre-graded." Dkt. 25-2. The end of this report, however, contains a "reviewer's comment" that states: "Documents pending. Pictures and police report in folder. Waiting on Bendix report." *Id.* Airgas points out that it was a preliminary report from before the Black Box Report became available. Dkt. 26. The Final Report, dated November 30, 2018 (Dkt. 24-8 at Ex. 1) states that the data from Bendix and PeopleNet indicates the driver applied the brakes and abruptly turned the steering wheel and the accident was thus caused by driver error. [5] *Id.*

---

[5] The Black Box Report relies on an analysis of the "Bendix ESP system." *See* Dkt. 24-6, Ex. 11. The report indicates that this system has "loss-of-control interventions" that will "apply one of more individual brakes to provide optimal vehicle control" if the system determines "that the actual vehicle path is deviating from the driver's intended path." *Id.*

The court agrees with Airgas that the Initial Report, which Airgas received prior to receiving the Black Box Report, is insufficient evidence to show pretext. It, in fact, shows that Airgas did not immediately decide to terminate Davis when he said the cause was ghost braking and instead took time to investigate this assertion.

### 3. Ramers's Deposition

During his deposition, Ramers said that on the day of the accident, he and Davis were just driving along and "the brakes locked up." Dkt. 25, Ex. E (Dkt. 25-5) at 30-31. Ramers said Davis was "working the steering wheel, doing the best he could do to keep it in the road," and noted that he gave Davis "props" and "thought he done a good job to keep us alive." *Id.* at 31. When asked to clarify what he meant by the brakes locking up, Ramers said "the brakes locked down, and the wheels weren't turning." *Id.* He opined, given his experience as a driver, that the automatic braking "OnGuard system" caused the accident. *Id.*

Airgas points out that Ramers did not testify about whether Davis pressed the brakes and said he was not looking at Davis and instead offered only his belief that the automatic braking system locked the brakes. *Id.* Airgas argues that this testimony is inappropriate summary judgment evidence because it is based solely on Ramers's beliefs and not on personal knowledge. *Id.* Ramers testified that the "brakes locked up" and that he *believed* the automatic braking system caused it. Dkt. 24-4 at 31. He was not asked about the black box data.

Ramers has not been presented to the court as an expert, so it is unlikely that his testimony about his belief regarding the cause of the accident would be admissible at trial. *See* Fed. R. Evid. 701 (stating that opinions of lay witnesses must be "rationally based on the witness's perception" and cannot be "based on . . . specialized knowledge within the scope of Rule 702"). Moreover, the fact that Ramers believed the accident was not preventable does not show that Airgas's reliance

on the Black Box Report to terminate Davis's employment was pretext and that it was really terminating Davis's employment because he reported a ghost braking issue.

### 4. Repair Estimate

Airgas got an estimate for the replacement of the front radar sensor and sensor cover on the truck's collision avoidance system on August 31, 2018; this is the system Davis contends locked up. Dkt. 25, Ex. F (Dkt. 25-6). Davis argues that this shows that there was a problem with the system. Dkt. 25. Airgas contends that this evidence cannot defeat summary judgment because it does not show that the collision avoidance system was damaged before the wreck. Instead, as shown from DeLussey's deposition testimony, the estimate was from after the truck was totaled during Davis's wreck and was based at least in part on Davis's statement that the radar system caused the accident. *Id.*

The court agrees that the fact that Airgas got a repair estimate prior to receiving the Black Box Report does not show pretext. In fact, it shows that Airgas believed Davis until it received the report, which lends further credence to Airgas's assertion that it terminated Davis's employment due to the contents of the Black Box Report.

### 5. Delussey/Evans Email

On September 25, 2018, Jeffrey Delussey sent an email to Michael Evans stating that there had been two other incidents with the new Peterbilt "on-guard systems" since Davis's jackknife. Dkt. 25, Ex. G (Dkt. 25-7). Delussey noted that in one of the incidents the driver reported he "was on the pedal going through a traffic light at about 20 mph, and he reported it locked the brakes." *Id.* Davis contends that this shows that there were problems with the system and that his accident was not preventable. Dkt. 25. Airgas asserts that the fact that some of its vehicles had ghost braking problems does not mean that ghost braking caused Davis's accident. Dkt. 26. Airgas also

17

asserts this email does not show pretext because it was written before the investigation into the wreck was completed. *Id.*

The court agrees with Airgas that the fact that Airgas was looking into the Bendix/On-Guard Systems and noting there were some problems with them does not mean that the finding in the Black Box Report that the Bendix/On-Guard System did not cause this particular accident is erroneous and that Aigas should not have relied on it. While certainly these reports would have been considerations in the investigation as to the cause of the accident, the court is not in the business of "'second-guessing . . . an employer's business decision.'" *Roberson-King v. La. Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)). They do not call into doubt the findings from the Black Box Report, and it was within Airgas's discretion to credit the report relating to this specific accident when making its termination decision.

### 6. Jennings Affidavit and Emails

In the affidavit Davis submits with his surreply, Nathan Jennings, who was Davis's supervisor prior to these events, states that he believes the accident was not preventable. Dkt. 27, Ex. 2 ("Based on the information I have received and the findings of the incident review call this incident was non-preventable on Adrian's part."). The emails from Nathan Jennings that are submitted with the affidavit detail reports of the warning alarm from the collision avoidance system activating even when the cruise control was turned off and being too loud in 2017. Dkt. 27, Ex. 1. Airgas argues that these emails are unauthenticated and undated and, regardless, Jennings left Airgas a year prior to Davis's accident, so he has no personal knowledge about

Davis's accident.[6]   Dkts. 26; 28.   Airgas also notes that the emails contain multiple levels of hearsay.   Dkt. 26.   Airgas also points out that nothing in these materials shows that it should not have relied on Black Box Report when determining the true cause of the accident.   Dkt. 28.

Under Federal Rule of Civil Procedure 56(c), Airgas may show that a fact cannot be genuinely disputed by showing that Davis "cannot produce admissible evidence in support of the fact" or that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible at trial."   Fed. R. Civ. P. 56(c)(1)(B)–(2).   Airgas's contention that the emails are unauthenticated can be remedied by presenting Jennings as a witness at trial; moreover, it has already been remedied by providing a post-response affidavit.   The hearsay issues could also possibly be remedied by calling other witnesses at trial.   However, the argument that Jennings has no personal knowledge about Davis's accident and is not presented as an expert would likely render his testimony that the accident was preventable inadmissible.   Jennings did have personal knowledge of the emails from 2017 and would be able to testify about these reports; however, these reports do not seem to relate to ghost braking.   *See* Dkt. 27, Ex. 1.

### 7.   Expert Report

In his response to the motion for summary judgment, Davis cites to an expert report by Russell Gill as evidence that the accident was not preventable.   *See* Dkt. 25 at 9.   However, while it appears that he intended to do so, Davis failed to attach the report to his response.   *See* Dkt. 25-4 (containing only a cover sheet for the Gill Report).   The initial expert report is, however, available in the Record, as Davis filed the report with the court independently.   *See* Dkt. 23-1.

---

[6] While the emails were not authenticated when Davis submitted them, the affidavit the court permitted him to file with the sur-reply authenticates the emails.

19

In the report, Gill reviewed the materials in this case, including the Black Box Report. *See id.* He also reviewed a Bendix Technical Bulletin that explains data parameters and a PeopleNet Onboard Event Recording Detail report. *Id.* Gill states that the Black Box Report "captured the second part of the event . . . Adrian Davis described." *Id.* Gill notes that an "issue of unintended application of braking due to a perceived collision in the collision avoidance system, 'ghost braking,' may not create [an event] deemed significant by the system and lock the event"—thus it would not be kept on the system. *Id.* He pointed out that ghost braking was present in some Peterbilt trucks at the time and Airgas was working on these issues. *Id.* He opines that the "fact that internal emails discuss the condition of ghost braking being present on multiple Peterbilt Truck Tractors and communication from the previous supervisor of Adrian Davis[, Jennings,] revealed that ghost braking was an issue on the subject truck prior to the subject crash suggests that ghost braking more likely than not was present and a substantial factor in bringing about the subject crash." *Id.* Airgas does not address the expert report in its reply.[7] If the ultimate question were whether the accident was preventable or not, this expert report would create an issue of material fact. That, however, is not what the court must determine.

The court must determine whether Davis's evidence, it total, creates genuine issues of material fact (1) that there is a causal link between Davis's alleged protected activity and his termination, and (2) that Airgas's stated reason for terminating Davis's employment was pretext and the real reason was because he complained about the ghost braking. The timing alone—termination about 100 days after the report—is not enough to show a causal link or pretext. Airgas

---

[7] The court notes that Airgas also provides an expert report in which its expert concludes that the "electronic data from the subject accident indicated the Bendix braking and stability systems were functioning properly and did not inadvertently activate to cause Mr. Davis to lose control of the tractor-trailer." Dkt. 24-11.

admits the termination was due to the accident that also caused Davis to report that ghost braking was to blame.  It did not terminate Davis's employment immediately after he said ghost braking caused the accident and instead performed an investigation, initially documented the cause as ghost braking, and got an estimate for fixing the problem that Davis reported.  This all points to Airgas initially believing Davis's assertion that ghost braking caused the accident.  Airgas did not terminate Davis's employment until it received the Black Box Report, which showed something different.

Davis provides evidence to support his contention the accident was not preventable in an attempt to call into question Airgas's stated reason for termination, presenting evidence that there may have been a problem with ghost braking with some trucks, that some of the data may not have been saved on the black box to prove ghost braking, and that Davis's co-driver thought the brakes locked up.  The court must decide whether this evidence would suggest to a reasonable juror that Airgas should have disregarded the Black Box Report and instead determined that the ghost braking was at fault.  It is of note that Davis's evidence indicates that Airgas did believe Davis prior to receiving the Black Box Report.  Moreover, the evidence shows that Airgas terminated the employment of other employees who did not allegedly engage in protected activity under the STAA because it determined they had preventable accidents that cost Airgas money.  *See* Dkts 24-8, 24-9.

While certainly Davis's expert's report could cause one to question whether Airgas should have relied so heavily on the Black Box Report, which is an exercise of Airgas's business judgment, there is nothing in the Record that would cause a reasonable juror to question that the Black Box Report—not Davis's complaints—caused Airgas to change the investigation report conclusion from not preventable to preventable, resulting in Davis's termination.  Accordingly,

the court finds that Davis has not met his burden of persuading the court that (1) the complaints caused the termination, and (2) Airgas's purported reason for the termination is pretext and the real reason it terminated Davis's employment was in retaliation for Davis reporting that ghost braking caused the accident.

## V. CONCLUSION

Airgas's motion for summary judgment (Dkt. 24) is GRANTED.  The court will issue a final judgment concurrently with this memorandum opinion and order.

Signed at Houston, Texas on June 4, 2021.

Gray H. Miller
Senior United States District Judge